S. A. SCHAFFER, DONALD L. SCHAFFER AND NEIL LUNDEE,

*Appellants*

(Defendants below)

vs.

STANDARD TIMBER COMPANY, A CORPORATION,

*Appellee*

(Plaintiff below)

(No. 2828; November 18th, 1958; 331 Pac. (2d) 611)

138

140

For the appellants, the cause was submitted upon the brief of Charles Stuart Brown of Afton, Wyoming.

For the appellee, the cause was submitted upon the brief and also oral argument of Frank R. Schofield of Green River, Wyoming, and Edgar J. Herschler of Kemmerer, Wyoming.

Heard before Blume, C. J., and Harnsberger and Parker, JJ.

## OPINION

Mr. Justice Parker delivered the opinion of the court.

Plaintiff, Standard Timber Company, brought action to recover a balance due from defendants, S. A. Schaffer, Donald L. Schaffer, and Neil Lundee, upon a written agreement and supplements purporting to sell to defendants all of the plaintiff company's stock for the purchase price of $65,000. Defendants denied generally the allegations of the petition and alleged affirmatively that:

(a) Plaintiff's president, F. Pace Woods, as a condition of the agreement and an inducement to the defendants had represented that the "corporation owned United States Forest Service Cutting permits" in the amount of 15 million board feet when defendants later learned that "there were only approximately five million board feet of such timber"; and

(b) Woods had guaranteed defendants would continue to hold a tie-sale contract with Union Pacific whereas plaintiff through Woods and White, its principal stockholders, had caused the loss of said timber contract with resulting damage.

Defendants pleaded failure of consideration and impossibility of performance but asserted payment of $32,038.18 prior to their discovery of the facts as to the quantity of timber and alleged no amounts due.

The court upon trial entered judgment for plaintiff and against defendants in the amount sought, $35,357.-86 plus interest. Defendants have now appealed, listing as specifications of error the court's incorrect rulings upon matters of evidence, the illegality of the judgment as being contrary to law and to the evidence, and the impropriety of the judgment as being entered without regard to the defenses of misrepresentation, mistake, failure of consideration, and impossibility of performance.

In the specifications of error there is complaint of various rulings of the trial court in permitting or prohibiting the asking of various questions, but an examination of the record discloses no impropriety in that respect. Moreover, defendants do not substantiate their complaints either by argument or brief and therefore may be taken to have waived them. Chicago, B. & Q. R. Co. v. Lampman, 18 Wyo. 106, 104 P. 533, 25 L.R.A., N.S., 217, Ann.Cas. 1912C, 788; Leach v. Frederick, 36 Wyo. 121, 253 P. 669; Posvar v. Pearce, 37 Wyo. 509, 263 P. 711; Stein v. Schuneman, 39 Wyo. 476, 273 P. 543; Peterson v. Le Faivre, 44 Wyo. 378, 12 P.2d 385. See 3 Am.Jur. Appeal and Error §§ 770, 776; 8 Bancroft's Code Practice and Remedies, 1928, p. 9389.

Defendants in their brief urge mutual mistake growing out of misrepresentation and fraud in the inducement, and plaintiff responds by arguing these questions. Accordingly, fraud now being made an integral part of defendants' philosophy, it is essential to consider it in conjunction with other factors. This defense must stand or fall depending upon the representations which plaintiff made regarding the number of board feet covered by plaintiff's permits with the U. S. Government. To recite all of the testimony on this subject would unduly burden this opinion, and it is sufficient to list certain statements of the witnesses which we deem to be illustrative of the testimony in general.

*S. A. Schaffer* (the moving figure on the part of defendants):

"Q. Would you indicate to the Court exactly what Mr. Woods said at this time? A. Well, he described that there was 15 million foot of timber under contract and a tie purchase order that could be had every year, as they had in the past for 14 years."

*Mrs. S. A. Schaffer:*

"Q. And at this time, what was said with respect to the quanity (sic) of timber available? A. Mr. Woods said to my husband, 'there's 15 million board feet of timber in the area' and he said, 'isn't that so Morris?' and Mr. Warpness said at the time, 'Well, it's more like 17 million and Mr. Woods explained that would be a little overrun on the estimation of the forest estimation, could overrun to 17 million.'

\* \* \* \*

"Q. Was there ever any conversation with respect to a single area as to the quanity (sic) of timber available? A. Yes, as we came down the road Mr. Woods was talking to Mr. Schaffer about the timber, as we came down the road and as we came along in this area

of this gulch, called Both Creek Gulch, he said, 'Now, right up there, see, is 15 million feet that has never been touched'."

*Hugh D. Schooley* (real estate broker) :

"Q. What was the approximate date of this meeting? A. Approximately the fore part of July, 1953.

"Q. Would you indicate to the Court, Mr. Schooley, what was said by Mr. Woods, with reference to the quanity (sic) of timber? A. There was a lot of conversation before and after, but the particular remark to which, I think you refer, is that Mr. Woods said that he thought there were about 15 million feet in the area.

"Q. Did you hear anyone else express an opinion or make a statement as to the amount of timber there? A. Yes.

"Q. And who made this statement? A. Morris Warpness.

"Q. And what did he say? A. He said, 'I think that there would be closer to 17 million feet'."

*Morris Warpness* (plaintiff's former manager) :

"Q. Did you make a statement that it must have been over 15 million? A. In excess, yes.

"Q. What was your statement? A. Well, could be, there could be possibly more than that because I had been through several areas there, lots of timber.

"Q. What were you talking about? A. Timber that's available to come in on to the roads and on to the Turkey Creek area, Pack Saddle."

*F. Pace Woods:*

"Q. Did you tell Mr. Schaffer that there were 15 million board feet in the area? A. I did not, I told him that I had heard that it was estimated that there were 15 million feet available to your roads and to our operation, but he could not depend upon that statement, he would have to check with the Forest Service or cruise the timber himself.

\* \* \* \*

"Q. Now, when you said there were 15 million board feet in the area, just exactly what area were you talking about? A. I didn't say there were 15 million board feet in the area, I said it was estimated that there were 15 million board feet in the area that we had not cut off in that area that our roads could serve. Now, when you build a road into an area you kinda feel you have some rights in there, because as Mr. Schaffer said, his roads are expensive.

"Q. Did you ever, at any time during the negotiations for the sale of Standard Timber, ever represent to Mr. Schaffer that the Standard Timber Company had holdings of 15 million board feet? A. I did not."

*Melvin E. Loveridge* (U. S. Forest Service officer in charge of timber management activities of Bridger National Forest) :

"Q. Mr. Loveridge, has that particular Snider Basin area been cruised by the Forest Department? A. Yes, it has.

"Q. What is the volume of lumber? * * * A. As I recall it something about 140 million board feet of timber is available in the Snider Basin area, but not all of that will be cut at this time.

"Q. Is that merchantable timber? A. Yes."

A review of this evidence indicates a serious conflict in the testimony regarding the representation which Woods made. If the testimony of S. A. Schaffer

is believed then the representation was made to the defendants that the plaintiff actually had within its control or contract over 15 million board feet of timber—and this was admittedly not true. If the opposing evidence is believed, Woods merely stated that such amount was available to the roads in the area. Mrs. S. A. Schaffer tended to corroborate this when she testified that "Mr. Woods said to my husband, 'there's 15 million board feet of timber in the area.'" What was meant by "in the area" is unclear as is all testimony concerning the location of plaintiff's roads completed prior to the agreement between the parties. Accordingly, the statement of Loveridge, the U. S. Forest Service officer, that there were over 140 million board feet of timber available in the Snider Basin is not meaningful as to this controversy. The rule is well settled that the appellate court will assume the evidence of the successful party to be true and leave conflicting evidence out of consideration. Rayburne v. Queen, Wyo., 326 P.2d 1108, 1111, and cases cited. Under this rule, we must suppose that Woods did not say that there were 15 million board feet of timber "under contract" but did say that there were "15 million feet available to your roads and to our operation," which statement because of lack of definition and explanatory testimony is comparatively meaningless. We are thus left with no proof of the affirmative defenses[1] relied upon. This court has often held that fraud must be alleged with particularity by stating with certainty and definiteness the tangible facts to support general averments of fraud and that the burden of proof is upon the person charging fraud to prove it by clear and convincing evidence. Kahn v. Traders' Ins. Co.,

---

[1] The defenses of fraud and mistake must be specially pleaded. 1 Bancroft's Code Pleading, 1926, pp. 128, 478.

4 Wyo. 419, 34 P. 1059, 62 Am.St.Rep. 47; First Nat.
Bank of Green River v. Barrett, 54 Wyo. 394, 93 P.2d
510. See also In re Adoption of Hiatt, 69 Wyo. 373,
242 P.2d 214; Chittim v. Belle Fourche Bentonite
Products Co., 60 Wyo. 235, 149 P.2d 142; Goldberg v.
Miller, 54 Wyo. 485, 93 P.2d 947, 96 P.2d 570; Smith v.
Stone, 21 Wyo. 62, 128 P. 612. The same rule is ap-
plicable to a party who relies on mistake as a basis
for avoiding a contract. See 17 C.J.S. Contracts § 566,
p. 1200; 1 Bancroft's Code Pleading, 1926, p. 478; 31
C.J.S. Evidence § 104, p. 714.

There is further reason why mistake is not a valid
defense in this case. Woods says he told Schaffer that
the entire matter must be checked with the Forest
Service; but regardless of what Woods said on this
subject, persons now complaining to have been misled
were obligated to use the ordinary means of informa-
tion available to them, which, under the circumstances,
were the records of the Forest Service. Defendants
apparently made no effort to check either the com-
pany's contracts or the Government records, and one
of them testified it was some two years after the agree-
ment was executed before he discovered what the true
situation was. This we think must be interpreted as
a lack of diligence, and they cannot now complain be-
cause of insufficient knowledge when this resulted
from indifference or credulity. A party preparing to
consummate a contract cannot be heard to complain
if he fails to make reasonably diligent inquiry regard-
ing the facts. Farmers' Lumber Co. v. Luikart, 36
Wyo. 413, 256 P. 84; id., 37 Wyo. 201, 259 P. 1053.
See also Burnett v. Taylor, 36 Wyo. 12, 252 P. 790; 5
Williston on Contracts, 1937, § 1516. A matter of
further significance on this phase of the problem is
that defendants for many months raised no question
regarding the amount of timber, making no complaint

until they were in arrears on the contract and pressure was being exercised to enforce payment.

Defendants by their answer alleged that both they and plaintiff:

"* * * believed there was in existence approximately fifteen million board feet of such lumber and conditioned the performance of said contract on such quantity * * *. * * * in the late fall of 1955, defendants learned that there were only approximately five million board feet of such timber, and that because of such shortage, it was impossible to perform payment obligations of the contract * * *."

This statement is not only ambiguous but is unsupported by the evidence. In the first place, the record clearly shows that there were "in existence" in the area many times the 15 million board feet of timber. In the second place, there was no clear showing that there was any impossibility of performance of the agreement by the defendants to secure additional timber by other contracts from the Government. S. A. Schaffer said:

"I cut all the timber that was available in these areas and machined it into ties and lumber, but being *no profit in lumber* and no more stumpage available under this contract, I couldn't do any more." (Emphasis supplied.)

From this statement it is clear that although defendants by pleading and by lipservice in their testimony claim that performance of the agreement was impossible they made no further effort because the operation had turned out to be *unprofitable*. A contract will not be presumed to have imposed an absurd or impossible condition upon one of the parties but will be interpreted as if the parties understood the

conditions at the time. Pacific-Wyoming Oil Co. v. Carter Oil Co., 31 Wyo. 314, 226 P. 193; id., 31 Wyo. 452, 228 P. 284.

"* * * the burden should be placed on the promisor to establish the defense of excusable impossibility * * *." 6 Williston on Contracts, 1938, p. 5425.

"* * * a promisor who is asserting his discharge must allege and prove the frustrating event and that after occurrence of the event it was impossible to render the promised performance or to attain the purpose for which the contract was made. * * *" 6 Corbin on Contracts, 1951, pp. 275, 276.

In the instant case there was no proof whatever of impossibility. Defendants state in their brief that the payment of the principal balance of $45,000 at the rate of five dollars per thousand feet of logs presupposes the existence of 15 million board feet. This statement must have been based on some erroneous calculation, but even if the figures had been correct, any such reasoning could not have been substituted for proof of the defense of impossibility.

The amended answer raises a further defense that plaintiff's president, F. Pace Woods, represented that defendants would continue to hold a contract to sell timber ties to the Union Pacific Railroad whereas the said Woods and White, stockholders in the plaintiff company, caused the loss of said contract with the Union Pacific and took the benefit to themselves in breach of their fiduciary duties and their representations and inducements. We find no proof in the record to substantiate such allegations.

It thus appears that the affirmative defenses alleged by defendants were wholly unsupported and are untenable.

Affirmed.